1

2

3

4

5

6

7

8             UNITED STATES DISTRICT COURT

9             SOUTHERN DISTRICT OF CALIFORNIA

10

11   DEANNA R.,                          Case No.:  19cv1358-W(RBB)

12                          Plaintiff,
                                         **REPORT AND**
13   v.                                  **RECOMMENDATION REGARDING**
                                         **CROSS-MOTIONS FOR SUMMARY**
14   ANDREW M. SAUL, Commissioner of     **JUDGMENT [ECF NOS. 13, 14]**
     Social Security,
15
                           Defendant.
16

17

18         On July 19, 2019, Plaintiff Deanna R.[1] commenced this action against Defendant

19   Andrew M. Saul, Commissioner of Social Security, for judicial review under 42 U.S.C.

20   section 405(g) of a final adverse decision for social security benefits [ECF No. 1].

21   Defendant filed the Administrative Record on October 21, 2019 [ECF No. 11].  On

22   November 25, 2019, Plaintiff filed a motion for summary judgment or remand [ECF No.

23   13].  The Commissioner filed a cross-motion for summary judgment and an opposition to

24

25   _____

26   [1] The Court refers to Plaintiff using only her first name and last initial pursuant to the Court's Civil Local
     Rules.  See S.D. Cal. Civ. R. 7.1(e)(6)(b).

27                                          1

28
                                                                    19cv1358-W(RBB)

Plaintiff's motion on December 6, 2019 [ECF No. 14].  Plaintiff filed a reply on January 13, 2020 [ECF No. 15].

The Court has taken the motions under submission without oral argument [ECF No. 12].  For the following reasons, the Court recommends that Plaintiff's motion for summary judgment be **GRANTED**, that Defendant's cross-motion for summary judgment be **DENIED**, and that the case be remanded for further proceedings.

## I.    BACKGROUND

On May 26, 2015, Plaintiff protectively filed applications for disability insurance benefits and supplemental security income under Titles II and XVI of the Social Security Act, respectively.  (Admin. R. 53, 229-38, ECF No. 11.) [2]  Plaintiff alleged that she has been disabled since May 22, 2015, due to neuropathy in her hands and feet.  (Id. at 50, 229, 233, 248.)[3]  Her applications were denied on initial review and again on reconsideration.  (Id. at 133-36, 142-47.)  An administrative hearing was conducted on February 1, 2018, by Administrative Law Judge ("ALJ") Andrew Verne, who determined on July 6, 2018, that Plaintiff was not disabled.  (Id. at 115-25.)  Plaintiff requested a review of the ALJ's decision; the Appeals Council for the Social Security Administration ("SSA") denied the request for review on May 20, 2019.  (Id. at 1-3.)  Plaintiff then commenced this action pursuant to 42 U.S.C. section 405(g).

### A.    Medical Evidence

On February 4, 2015, Plaintiff went to Urgent Care at San Ysidro Health Center, where she reported numbness in both hands.  (Id. at 346.)  She stated that her symptoms

---

[2] The administrative record is filed on the Court's docket as multiple attachments.  The Court will cite to the administrative record using the page references contained on the original document rather than the page numbers designated by the Court's case management/electronic case filing system ("CM/ECF"). For all other documents, the Court cites to the page numbers affixed by CM/ECF.

[3] In a memorandum prepared in advance of her administrative hearing, Plaintiff, through her counsel, asserted that in addition to neuropathy, she was disabled due to chronic headaches, rheumatoid arthritis, hepatitis C, and chronic obstructive pulmonary disease (COPD).  (Id. at 310.)

2

had started one day before, but that she had experienced similar problems with her legs and feet for "a long time." (Id.) On February 23, 2015, Plaintiff began treatment with Karen Law, M.D., at the San Ysidro Health Center. (Id. at 339-45.) Deanna R. told Dr. Law that she had been experiencing numbness and electric shocks in her feet for three years, and that her "feet fell asleep and never woke up." (Id. at 339.) Plaintiff stated that she had lost sensation in her hand and that, for example, although she could pick up a roll of quarters, she could not pick up a single quarter. (Id.) She had brown spots on her legs that had increased since her neuropathy started. (Id.) Dr. Law suspected that Plaintiff's symptoms of joint pain, peripheral neuropathy, cognitive defects, headaches, and vision changes were indicative of lupus, rheumatoid arthritis, and Raynaud's disease. (Id. at 344.)[4] Dr. Law ordered lab work, urinalysis, and hand x-rays, and referred Deanna R. for consultations with rheumatology and ophthalmology. (Id.) Dr. Law noted that Plaintiff worked as a bartender. (Id. at 340.)

Plaintiff next saw a neurologist, Edward B. Friedman, M.D., on March 17, 2015. (Id. at 314-17.) She told Dr. Friedman that she had experienced migraine headaches for her "whole life" and an "ice pick" type of pain on the right side. (Id. at 314.) She had taken Excedrin three to four times per day, six to seven days per week, for years, and had felt "much better" since starting an allergy pill. (Id.) Deanna R. stated that she rode a motorcycle, had issues with her hands, and was having difficulty shifting with her left leg. (Id. at 315.) After examining Plaintiff, Dr. Friedman found that she had evidence of a peripheral neuropathy affecting her legs which could be related to her hepatitis C, a liver infection, which she had been diagnosed with since 1995. (Id. at 317, 812.)

---

[4] Raynaud's disease causes some areas of the body, such as fingers and toes, to feel numb and cold due to cold temperatures or stress. See Mayo Clinic, https://www.mayoclinic.org/diseases-conditions/raynauds-disease/symptoms-causes/syc-20363571 (last visited Mar. 20, 2020). Symptoms can include color changes in the skin and numbness and stinging pain. Id.

3

Although he initially suspected that Deanna R.'s hand symptoms were related to carpal tunnel syndrome, a subsequent nerve conduction study ruled this out. (Id. at 317-18.) The nerve conduction study did indicate a primarily sensory neuropathy. (Id. at 318.) Dr. Friedman concluded that Plaintiff's migraines did not require treatment at that time. (Id. at 317.)

On March 31, 2015, Deanna R. informed Dr. Law, her primary care doctor, that she had quit one of her jobs, cut back on the other one, and that her daughter was moving in with her in May. (Id. at 333.) Dr. Law characterized the lesions on Plaintiff's legs as vasculitis[5] of the skin, possibly caused by hepatitis, and considered checking Plaintiff's cryoglobulins.[6] (Id. at 337.) By May 8, 2015, Plaintiff was considering applying for social security disability because she was unable to open bottles or pick things up and was concerned that she would eventually not be able to work. (Id. at 327.)

Plaintiff started seeing Dr. Dana Copeland Reddy, a rheumatologist, on June 8, 2015. (Id. at 386-87.) Dr. Reddy's assessment was that Plaintiff had chronic hepatitis C, Raynaud's syndrome, and purpuric vasculitis, which was most likely due to cryoglobulinemia. (Id. at 387.) The physician noted that treatment for cryoglobulinemia included treatment of hepatitis C and possibly Rituxan.[7] (Id.) Deanna R.'s lab work confirmed Dr. Reddy's assessment. (Id. at 385.) Dr. Reddy planned to consult with a hepatologist, Dr. Hassanein, regarding Plaintiff's case. (Id.) Dr. Hassanein did not return

---

[5] Vasculitis is inflammation of the blood vessels. See Mayo Clinic, https://www.mayoclinic.org/diseases-conditions/vasculitis/symptoms-causes/syc-20363435 (last visited Mar. 19, 2020).

[6] Cryoglobulins are abnormal proteins in the blood. Cryoglobulinemia is the clumping together of these proteins and can cause damage to skin, joints, nerves, and organs. See Mayo Clinic, https://www.mayoclinic.org/diseases-conditions/cryoglobulinemia/symptoms-causes/syc-20371244 (last visited Mar. 19, 2020).

[7] Rituxan is a type of antibody therapy that can be used alone or with chemotherapy. See https://www.rituxan.com/patient/what-is-rituxan.html (last visited Mar. 19, 2020).

Dr. Reddy's call, but his report stated that because Plaintiff's liver looked normal on ultrasound and her liver function tests were normal, treatment of her hepatitis C was not indicated at that time.  (Id. at 382-83.)

On August 31, 2015, state agency medical consultant Dr. A. Pan, reviewed Plaintiff's case and opined that she had the residual functional capacity to perform light work; could frequently climb ramps and stairs, balance, stoop, kneel, crouch, and crawl; could occasionally climb ladders, ropes, and scaffolds; and could frequently perform handling and fingering tasks.  (Id. at 58-60.)  The next day, September 1, 2015, Deanna R. reported to treating physician Dr. Law that her toes had been gradually getting worse and were locking up, and that she was having more pain in her hand.  (Id. at 416.) Plaintiff stated that she could only stand for five to ten minutes and could sit up for only thirty minutes because of her leg pain.  (Id.)  She described constant tingling in her legs and stated that they would "go blank" and become totally numb.  (Id.)  Plaintiff related that Dr. Hassanein, the hepatologist, had told her that treatment of her hepatitis C would be "good" but her insurance would likely not pay for it.  (Id.)  Dr. Law noted that Deanna R.'s neuropathy was "somewhat controlled" on gabapentin and that the neuropathy and tetany[8] in her toes were likely related to cryoglobulinemia.  (Id. at 420.)

On September 14, 2015, Plaintiff underwent psychological testing by Marcie Goldman, Ph.D., at the request of the Department of Social Services.  (Id. at 363-65.) Deanna R. denied any mental health history and told Dr. Goldman that her hand problems came and went, but that day was a relatively good day.  (Id. at 363.)  Her daily activities included bathing and dressing herself, playing with her granddaughter, watching television, preparing her own meals, and doing household chores when her hands were

---

[8] Tetany is defined as a spasm of muscles.  See Merriam-Webster, https://www.merriam-webster.com/dictionary/tetany (last visited Mar. 19, 2020).

not hurting.  (Id.)  Dr. Goldman found that Plaintiff's immediate memory, abstract reasoning, general knowledge, and vocabulary were in the low average range.  (Id.) From a psychological standpoint, Deanna R. had moderate restrictions in the area of performing complex tasks due to her low average cognitive functioning, but only mild or no restrictions in all other areas.  (Id. at 365.)

Plaintiff fell at home on October 1, 2015, and went to the emergency room at Sharp Coronado Hospital.  (Id. at 373-75.)  X-rays showed fractures in her left foot and right ankle.  (Id. at 378-79.)  Deanna R. received a consultation from orthopedic surgeon Dr. Michael L. Collins and initially opted to not proceed with surgery.  (Id. at 558-60.) Dr. Collins provided Plaintiff with CAM (controlled ankle movement) boots for each leg and instructed her to place only partial weight on her right heel and no weight on her left foot.  (Id. at 560.)  Plaintiff was unsure how the fall happened; she may have tripped over the carpet, or it could have been due to her neuropathy.  (Id. at 556; see also id. at 373.) Deanna R. continued to follow up with Dr. Collins over the next several months; he eventually determined that she had exhausted all conservative measures and required surgical intervention.  (Id. at 546-57.)  She underwent open reduction and internal fixation of the fifth metatarsal in her left foot on February 12, 2016.  (Id. at 529-30.)  Dr. Reddy, the treating rheumatologist, decided that Plaintiff would need to hold off on Rituxan treatment for her cryoglobulinemia until she had recovered from surgery.  (Id. at 381, 477.)  Deanna R. reported to Dr. Law around this time that her neuropathy was getting worse; she was feeling more electric shocks in her fingers; the toes on her left foot were locking up; and she had numbness in her left thigh.  (Id. at 660, 669.)

Plaintiff saw Dr. Collins, the orthopedic surgeon, for periodic post-surgical follow-up appointments.  (Id. at 540-45.)  By April 19, 2016, she was bearing full weight on her left foot and was able to work in the yard and go about normal activities with minimal discomfort.  (Id. at 540-41.)  On April 20, 2016, state agency physician R. Dwyer, M.D.,

6

agreed with the previous assessment of Plaintiff's residual functional capacity offered by state agency physician Dr. Pan. (Id. at 89-91.)

On May 17-18 and May 31-June 1, 2016, Plaintiff was admitted overnight into Scripps Mercy Hospital for Rituxan therapy, which was administered intravenously in two doses in a manner similar to chemotherapy. (Id. at 567-68, 578, 604-06, 611.) On June 15, 2016, she told Dr. Law that the treatment had not helped and that her pain was getting worse. (Id. at 648.) Deanna R. stated that she took 300 milligrams of gabapentin during the day, less than the recommended dosage, because it made her sleepy, but she was feeling more electric shocks down her legs. (Id.) Dr. Law recommended that Plaintiff go back to her regular dose of gabapentin and suggested that other therapies for her neuropathy and mood be considered. (Id. at 652.) The treating physician also referenced Plaintiff's history of migraine headaches with blurred vision, and noted that Deanna R.'s ear, nose, and throat physician was referring her to neurology for further work-up. (Id.) Plaintiff's diagnoses included memory problems, rheumatoid arthritis involving both hands with positive rheumatoid factor, mixed cryoglobulinemia, frequent headaches, viral hepatitis C, and polyneuropathy. (Id.) Because Plaintiff's condition was worsening and the Rituxan therapy was having no effect, Dr. Reddy, the rheumatologist, decided to contact another hepatologist about treatment of Plaintiff's hepatitis C. (Id. at 718.)

On July 12, 2016, Deanna R. informed Dr. Collins, the orthopedic surgeon, that she was no longer able to bear weight in her left foot for extended periods due to pain and discomfort. (Id. at 932.) Plaintiff consulted Dr. Friedman, her neurologist, on July 27, 2016, regarding her daily headaches. (Id. at 871.) Dr. Friedman instructed Deanna R. to stop her chronic usage of Excedrin and suggested that her daily headaches would abate within two weeks if she did so. (Id.) He also noted that Plaintiff's migraine headaches were infrequent and had occurred only once over the last year. (Id.) On August 9, 2016,

7

Plaintiff started seeing Dr. Daniel Park, an infectious disease specialist, regarding her hepatitis C, at Dr. Reddy's referral.  (Id. at 812.)  Dr. Park agreed with Dr. Reddy's assessment that Deanna R. should receive curative hepatitis treatment and that the treatment would likely improve Plaintiff's cryoglobulinemia and prevent it from getting worse.  (Id. at 716, 816.)  Dr. Reddy had also recommended that Plaintiff continue taking gabapentin as well as tramadol for pain.  (Id. at 716.)

On August 19, 2016, treating physician Dr. Law completed a "Disability Impairment Questionnaire" on Plaintiff's behalf.  (Id. at 731-35.)  She listed Deanna R.'s primary symptoms as numbness and tingling of hands and feet, pain in left foot status post-surgery, inability to grip due to sensory loss, gait instability due to neuropathy, and cramping of extremities; she also set forth the clinical and laboratory findings supporting her diagnoses.  (Id. at 731-32.)  Dr. Law opined that Plaintiff could sit for less than one hour in an eight-hour workday, would need to get up every fifteen minutes if she sat for longer than an hour, and could stand or walk for one hour at best in an eight-hour day.  (Id. at 733.)  She also stated that Plaintiff could never lift or carry more than ten pounds and had significant limitations in reaching, handling, and fingering.  (Id. at 733-34.)  In a letter dated August 20, 2016, Dr. Law explained that Deanna R. might have some recovery of function after treatment of her hepatitis C, but it was possible that her neuropathic pain would persist after treatment.  (Id. at 737.)  Dr. Law concluded that Plaintiff's disability had lasted more than twelve months and her ability to work full-time was impaired.  (Id.)  On August 25, 2016, Plaintiff presented to Dr. Park, who was managing her hepatitis C treatment, with complaints of profound fatigue, sleeping all day, no energy, and difficulty performing activities of daily living.  (Id. at 802.)  He requested approval to treat Deanna R.'s hepatitis C with a medication called Harvoni.  (Id. at 805.)

8

Dr. Reddy, Plaintiff's treating rheumatologist, completed a "Disability Impairment Questionnaire" on September 15, 2016. (Id. at 739, 743.) She described Plaintiff's diagnosis as "cryoglobulinemia with severe sensory neuropathy leading to pain in hands and feet and fall with bilateral lower extremity fractures requiring surgery on the left foot." (Id. at 739.) The clinical and laboratory findings supporting her diagnosis included a hepatitis C viral load of 10,200,000,[9] cryoglobulins of 58, limited sensation distal[10] to wrists and ankles, rash of lower extremities with scarring, and fractures of the left foot and right ankle. (Id.) She believed that Plaintiff could sit for five to six hours or more in an eight-hour workday and could stand or walk for one to two hours. (Id. at 741.) Plaintiff would need to get up from a seated position to move around every one to two hours, could never lift and carry over twenty pounds, but could occasionally lift and carry ten to twenty pounds. (Id. at 741.) Dr. Reddy also noted that Deanna R. had significant limitations in reaching, handling, and fingering due to decreased sensation in her hands; she would need to take unscheduled breaks at unpredictable intervals during the workday. (Id. at 742.)

On October 3, 2016, Plaintiff complained of migraines and heart palpitations to Dr. Law, her treating doctor. (Id. at 792, 795-96.) Dr. Law recommended that Plaintiff wean down on Excedrin to help her headaches. (Id. at 795.) The following day, Dr. Park counseled Deanna R. on taking Harvoni, which he prescribed to be taken once daily for twelve weeks. (Id. at 791.) On November 15, 2016, around the midpoint of the twelve-week regimen, Plaintiff reported to Dr. Park that she was doing well and had no

---

[9] The "viral load" of hepatitis C refers to the amount of virus present in the bloodstream. A "high" viral load is usually greater than 800,000 IU/L and a "low" viral load is usually less than that amount. United States Department of Veterans Affairs, https://www.hepatitis.va.gov/hcv/patient/diagnosis/labtests-RNA-quantitative-testing.asp (last visited Mar. 20, 2020).

[10] "Distal" means "situated away from the point of attachment or origin or a central point especially of the body." Merriam-Webster, https://www.merriam-webster.com/dictionary/distal (last visited Mar. 23, 2020).

complaints regarding the treatment other than fatigue.  (Id. at 781.)  Her hepatitis C viral load was 7,000,000.  (Id. at 785.)  By November 29, 2016, the amount of virus in her bloodstream was undetectable and she was considered hepatitis free.  (Id. at 774, 778.)  On January 5, 2017, she reported to Dr. Park that she felt better, had much more energy, and did not have any further rashes.  (Id. at 769.)

The following month, on February 7, 2017, Deanna R. saw her orthopedic surgeon, Dr. Collins, because she felt that one of the screws from her foot surgery was coming loose.  (Id. at 934-35.)  At that time, however, she was able to walk on the beach, walk her granddaughter a half mile to school, and ride her motorcycle with minimal discomfort.  (Id.)  Dr. Collins recommended that Plaintiff keep the hardware in her foot unless the pain affected her normal activities.  (Id. at 935.)  On February 9, 2017, Plaintiff told Dr. Law that her neuropathy was not progressing as fast, she was planning to visit Minnesota for two months to see her baby granddaughter, and was taking daily walks on the beach, but was often tired.  (Id. at 763.)  On February 13, 2017, Dr. Reddy observed that although Plaintiff was feeling well after her curative hepatitis C treatment and her cryoglobulinemia had not progressed, symptoms relating to her chronic neuropathy and Raynaud's syndrome continued.  (Id. at 757-58.)

Deanna R. next saw Dr. Law on June 23, 2017.  (Id. at 836, 841.)  She reported that her whole body felt sore all the time and her condition had been gradually worsening over the last six months.  (Id. at 836.)  Plaintiff also stated that she felt depressed and had little interest or pleasure in doing things.  (Id. at 838.)  Dr. Law thought that Plaintiff's generalized pain might be due to fibromyalgia and recommended that Plaintiff stop taking gabapentin and start taking Lyrica.  (Id. at 839-40.)  On July 11, 2017, Plaintiff told Dr. Collins, the orthopedic surgeon, that she wanted to move forward with removal of the surgical hardware from her left foot as she had developed discomfort there.  (Id. at 936-37.)  Deanna R. informed Dr. Reddy, her treating rheumatologist, of her diffuse body

pain on July 27, 2017.  (Id. at 834.)  Plaintiff stated that Lyrica was helping her symptoms more than gabapentin had, but she felt lightheaded when taking Lyrica so had stopped taking it in the morning.  (Id.)  Dr. Reddy recommended that Plaintiff decrease her dosage of Lyrica if needed, but she should continue taking it twice per day.  (Id. at 835.)  Dr. Reddy also suggested that Plaintiff consider taking another medication, Cymbalta, for both neuropathy and fibromyalgia, but Plaintiff opted not to do so at that time.  (Id.)

On August 4, 2017, Plaintiff was seen at San Ysidro Health Center for pre-operative clearance for her left foot revision surgery.  (Id. at 842.)  In relation to her recent complaints of dyspnea,[11] she stated that she could walk several blocks and climb stairs, but pain in both of her lower extremities usually limited her ability to do so rather than difficulty breathing.  (Id.)  Deanna R. underwent surgery to remove the painful hardware from her foot on August 31, 2017.  (Id. at 940.)  She told Dr. Collins that her symptoms had significantly improved two days following her surgery.  (Id.)  Two months later, on October 24, 2017, she explained to Dr. Collins that she was satisfied with her surgical outcome but was experiencing pain all over her body and was unable to determine if the symptoms in her foot were due to her recent surgery or her chronic pain.  (Id. at 943.)  On January 5, 2018, Dr. Law reiterated her diagnoses of fibromyalgia and neuropathy, and recommended that Plaintiff follow up a pulmonologist for her dyspnea.  (Id. at 306-07.)

**B.    Hearing Testimony**

On February 1, 2018, Deanna R. appeared with her attorney at a hearing before ALJ Verne.  (Id. at 56.)  Plaintiff testified that her date of birth was June 15, 1963, she

---

[11] Dyspnea is "difficult or labored respiration."  See Merriam-Webster, https://www.merriam-webster.com/dictionary/dyspnea (last visited Mar. 20, 2020).

lived with her daughter and granddaughter, and she had a high school education.  (Id. at 18, 20.)  She had worked as a bartender for twenty-five years; for the last ten years, she had worked at the Manhattan full-time and at another bar on weekends.  (Id. at 21-22.)  She described her job duties as, "[Y]ou're dealing with the bands, you're dealing with customers good and bad, you have to keep track of all the drinks and all the money and all the tabs . . . plus the stocking and the running and the tapping kegs and, you know, things like that."  (Id. at 24.)  She had also performed occasional part-time work doing biohazard cleanup on cruise ships and filing for a property management office.  (Id. at 23-24.)  When the ALJ asked Deanna R. why she could no longer work, she responded:

> Well, it started about five years ago, actually.  My feet fell asleep and they wouldn't wake up.  And it progressively just started getting worse and worse and worse.  It's like if you went to a dentist and you got a shot for Novocain and your jaw gets all crazy and tingly.  That's my hands and my feet all the time.  And then when they go out, it's like when it turns into, like, a block of wood and you can't feel it at all.  That's what my feet progressed to and so it would be like there's nothing there, and you can't even, like, walk until the depth perception [sic].  Your hands, when that happens, we had to put flip handles in my house to open the doors.  And trying to use the thumb when my hand does that, it's just, like, stupid.  So, they put me on medicine and the medicine helps keep the, like, the block of wood at bay.  But all that tingling and agitation is still there, but the medicine makes me so spacy and so out there that a simple thing like at home, like washing the dishes, I'd wash all the dishes and get all the way through them and realize I didn't rinse a single one of those dishes.

(Id. at 25-26.)

Plaintiff testified that she had used a wheelchair and a walker after she sustained fractures to both of her feet, and still used a shower chair because she was unable to stand long enough in the shower to wash her hair, but otherwise did not use any assistive devices.  (Id. at 30-31.)  She stated that she took Lyrica to keep the "block of wood" feeling at bay but that it made her "spacy" and sleepy.  (Id. at 32.)  Deanna R. explained that she was not able to tend bar because she could not "run up and down the bar" and if

she picked up a bottle, it would fall right out of her hands and shatter.  (Id. at 33.)  She stated that her daughter performed the household chores, but Deanna R. helped when she could.  (Id. at 34.)

Vocational expert ("VE") Ron Fleck also testified at the hearing.  (Id. at 36.)  He testified that Plaintiff's past relevant work was as a bartender and general office clerk, both of which were semi-skilled occupations in the light category.  (Id. at 38.)[12] Referencing the residual functional capacity provided by the state agency medical consultants, Drs. Pan and Dwyer, the ALJ posed the following hypothetical question to the VE:

> Let's assume a hypothetical person of the claimant's age, education, and with the past work as described.  Further assume that this individual has the capacity to lift and carry, push and pull, [twenty] pounds occasionally and [ten] pounds frequently.  This person is capable of standing and/or walking six hours and sitting six hours in an eight-hour workday.  This person can frequently climb ramps and stairs but only occasionally climb ladders, ropes, and scaffolds.  The individual is capable of frequently balancing, stooping, kneeling, crouching, and crawling.  This individual can frequently handle, finger, and feel bilaterally.

(Id. at 39.)  The VE testified that such a person could perform both the bartender and general clerk jobs.  (Id. at 39-41.)  If a reaching limitation was added, such that the person could only reach in all directions frequently, she could still do the bartending job.  (Id. at 47.)  If the person could only stand or walk for four hours, she could perform work as an office clerk but not as a bartender.  (Id. at 42.)  The VE also stated that a person who could stand or walk for four out of eight hours could perform other jobs in the light category including gate guard, marker, sewing machine operator, and ticket taker.  (Id. at

---

[12] Light work involves lifting no more than twenty pounds at a time with frequently lifting or carrying of objects weighing up to ten pounds, and either significant walking or standing, or sitting with some pushing and pulling of arm or leg controls.  See 20 C.F.R. §§ 404.1567(b), 416.967(b) (2019).

42-44.) The VE further testified that if handling, fingering, and feeling could only be performed "occasionally" rather than "frequently," the person would not be able to perform Plaintiff's past work or any work. (Id. at 44.)[13] If a person was "off-task" ten percent or more of the time, this would also preclude any work. (Id.)

## C. **ALJ's Decision**

On July 6, 2018, the ALJ issued a decision finding that Deanna R. had not been under a disability, as defined in the Social Security Act, from her alleged onset date through the date of the decision. (Id. at 42-51.) ALJ Verne stated that Plaintiff met the insured status requirements of the Social Security Act through December 31, 2020. (Id. at 117.) He also determined that Plaintiff had not engaged in substantial gainful activity since May 22, 2015, the alleged onset date. (Id. at 118.) The ALJ found that Deanna R.'s peripheral neuropathy, history of right leg fracture, and status post-removal of hardware from her left foot fifth metatarsal were severe impairments, but her migraine headaches, hepatitis C, Raynaud's syndrome, depression, and anxiety were not severe. (Id. at 118-19.) The ALJ found that, singly or in combination, Plaintiff did not have impairments that met or medically equaled a listing. (Id. at 120.) He further determined that Deanna R. has the residual functional capacity to perform light work with the following exceptions: she is able to lift, carry, push, and pull twenty pounds occasionally and ten pounds frequently; she is able to stand and/or walk for six hours in an eight-hour workday; she is able to sit for six hours in an eight-hour workday; she is frequently able to climb ramps and stairs, balance, stoop, kneel, crouch, and crawl; she is occasionally able to climb ropes, ladders, and scaffolds; and she is frequently able to handle, finger,

---

[13] "Frequently" is defined as occurring from one-third to two-thirds of an eight-hour workday; "occasionally" means occurring from very little to up to one-third of the workday. SSR 83-10, 1983 WL 31251, at *5, *6 (Jan. 1, 1983).

and feel bilaterally.  (Id. at 121.)  The ALJ concluded that Plaintiff could perform her past relevant work as a bartender.  (Id. at 124.)

On August 8, 2018, Plaintiff requested that the Appeals Council reconsider the ALJ's decision.  (Id. at 225-28.)  On May 20, 2019, the Office of Appellate Operations notified Deanna R. that the Appeals Council had denied her request for review and that the ALJ's decision was the final decision of the Commissioner in her case.  (Id. at 1-3.)

## II.     LEGAL STANDARDS

Sections 405(g) and 421(d) of the Social Security Act allow unsuccessful applicants to seek judicial review of a final agency decision of the Commissioner.  42 U.S.C.A. §§ 405(g), 421(d) (West 2011).  The scope of judicial review is limited, however, and the denial of benefits "'will be disturbed only if it is not supported by substantial evidence or is based on legal error.'"  Brawner v. Sec'y of Health & Human Servs., 839 F.2d 432, 433 (9th Cir. 1988) (quoting Green v. Heckler, 803 F.2d 528, 529 (9th Cir. 1986)); see also Garrison v. Colvin, 759 F.3d 995, 1009 (9th Cir. 2014). Substantial evidence means "'more than a mere scintilla but less than a preponderance; it is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.'"  Sandgathe v. Chater, 108 F.3d 978, 980 (9th Cir. 1997) (quoting Andrews v. Shalala, 53 F.3d 1035, 1039 (9th Cir. 1995)).  The court must consider the entire record, including the evidence that supports and detracts from the Commissioner's conclusions.  Desrosiers v. Sec'y of Health & Human Servs., 846 F.2d 573, 576 (9th Cir. 1988).  If the evidence supports more than one rational interpretation, the court must uphold the ALJ's decision.  Allen v. Heckler, 749 F.2d 577, 579 (9th Cir. 1984).  The district court may affirm, modify, or reverse the Commissioner's decision.  42 U.S.C.A. § 405(g).  The matter may also be remanded to the Social Security Administration for further proceedings.  Id.

To qualify for disability benefits under the Social Security Act, a claimant must show two things:  (1) The applicant suffers from a medically determinable impairment that can be expected to result in death or that has lasted or can be expected to last for a continuous period of twelve months or more; and (2) the impairment renders the applicant incapable of performing the work that he or she previously performed or any other substantially gainful employment that exists in the national economy.  See 42 U.S.C.A. §§ 423(d)(1)(A), (2)(A) (West 2011).  An applicant must meet both requirements to be classified as "disabled."  Id.  The applicant bears the burden of proving he or she was either permanently disabled or subject to a condition which became so severe as to disable the applicant prior to the date upon which his or her disability insured status expired.  Johnson v. Shalala, 60 F.3d 1428, 1432 (9th Cir. 1995).

The Commissioner makes this assessment by employing a five-step analysis outlined in 20 C.F.R. § 404.1520.  See also Tackett v. Apfel, 180 F.3d 1094, 1098-99 (9th Cir. 1999) (describing five steps).  First, the Commissioner determines whether a claimant is engaged in "substantial gainful activity."  If so, the claimant is not disabled.  20 C.F.R. § 404.1520(b) (2019).  Second, the Commissioner determines whether the claimant has a "severe impairment or combination of impairments" that significantly limits the claimant's physical or mental ability to do basic work activities.  If not, the claimant is not disabled.  Id. § 404.1520(c).  Third, the medical evidence of the claimant's impairment is compared to a list of impairments that are presumed severe enough to preclude work; if the claimant's impairment meets or equals one of the listed impairments, benefits are awarded.  Id. § 404.1520(d).  If not, the claimant's residual functional capacity is assessed and the evaluation proceeds to step four.  Id. § 404.1520(e).  Fourth, the Commissioner determines whether the claimant can do his or her past relevant work.  If the claimant can do their past work, benefits are denied.  Id.

19cv1358-W(RBB)

1 § 404.1520(f).  If the claimant cannot perform his or her past relevant work, the burden

2 shifts to the Commissioner.  In step five, the Commissioner must establish that the

3 claimant can perform other work.  Id. § 404.1520(g).  If the Commissioner meets this

4 burden and proves that the claimant is able to perform other work that exists in the

5 national economy, benefits are denied.  Id.

6 <center>**III.   DISCUSSION**</center>

7 Plaintiff argues that the ALJ failed to properly evaluate the opinions of her treating

8 physicians, failed to properly evaluate her residual functional capacity, and failed to

9 present a complete hypothetical question to the VE.  (Pl.'s Mot. Attach. #1 Mem. Supp.

10 Summ. J. 13-23, ECF No. 13.)

11 **A.     Treating Physician Opinions**

12 Plaintiff maintains that the ALJ improperly evaluated the opinions of treating

13 physicians Dr. Law and Dr. Reddy.  (Id. at 13-18.)  Specifically, she contends that the

14 ALJ should have accorded the opinions controlling weight or at least some deference, and

15 he failed to articulate specific and legitimate reasons for giving the opinions reduced

16 weight.  (Id.)  Defendant counters that the ALJ reasonably found that the medical

17 evidence did not support the functional limitations assessed by Drs. Law and Reddy and

18 better comported with the opinions of the state agency physicians, Dr. Pan and Dr.

19 Dwyer, regarding Plaintiff's residual range of functioning.  (Def.'s Mot. Attach. #1 Mem.

20 Supp. Summ. J. 4-5, ECF No. 14.)  Defendant also argues that the ALJ properly found

21 that the efficacy of Plaintiff's treatment was consistent with his formulation of her

22 residual functional capacity, which was based upon Dr. Pan's and Dr. Dwyer's opinions.

23 (Id. at 5-6.)

24

25

26

27

<center>17</center>

28

Generally, a treating physician's opinion is given more weight by the SSA than a nontreating physician's opinion. 20 C.F.R. § 404.1527(c)(2) (2019).[14] A treating physician's opinion is given "controlling weight" if it is "well-supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with the other substantial evidence in [the] record." Id. When the treating source's medical opinion is not given controlling weight, the following factors are considered: length of the treatment relationship and the frequency of examination, and whether the physician has "obtained a longitudinal picture" of the claimant's impairment; the nature and extent of the treatment relationship, and whether the treating source has "reasonable knowledge" of the claimant's impairment; supportability of the medical opinion; consistency of the opinion with the record as a whole; the physician's specialization; and other factors. Id., § 404.1527(c)(2)(i)-(ii), (c)(3)-(6). A finding that a treating physician's medical opinion should not be accorded "controlling weight" does not mean that the opinion is rejected. Orn v. Astrue, 495 F.3d 625, 631-32 (9th Cir. 2007). "In many cases, a treating source's medical opinion will be entitled to the greatest weight and should be adopted, even if it does not meet the test for controlling weight." Id. at 632.

If the treating physician's opinion is not contradicted by another doctor, the ALJ may reject the opinion only by articulating "clear and convincing" reasons supported by substantial evidence in the record. Lester v. Chater, 81 F.3d 821, 830 (9th Cir. 1995). If the treating physician's opinion is contradicted by another doctor, the ALJ may reject the opinion of the treating physician only by giving "specific and legitimate" reasons for doing so that are based on substantial evidence in the record. Id. (citing Murray v. Heckler, 722 F.2d 499, 502 (9th Cir. 1983)). When a nontreating physician relies on the

---

[14] For claims, such as Plaintiff's, filed before March 27, 2017, the standard for evaluating opinion evidence is set forth in 20 C.F.R. § 404.1527(c)(2). For claims filed on or after March 27, 2017, the rules in 20 C.F.R. § 404.1520c apply. See 20 C.F.R. § 404.1527 (2019); 20 C.F.R. § 404.1520c (2019).

same clinical findings as a treating physician, but differs only in his or her conclusions, the conclusions of the nontreating physician are not considered "substantial evidence." Orn, 495 F.3d at 632. By contrast, when a nontreating physician provides "'independent clinical findings that differ from the findings of the treating physician,' such findings are 'substantial evidence.'" Id. (citations omitted). Independent clinical findings can consist of either (1) diagnoses that differ from those provided by another physician and that are supported by substantial evidence or (2) findings based on objective medical tests that the treating doctor has not considered. Id. (citing Andrews, 53 F.3d at 1041). A contradictory opinion by a nonexamining physician alone does not constitute substantial evidence. Lester, 81 F.3d at 831; Magallanes v. Bowen, 881 F.2d 747, 752 (9th Cir. 1989.

### 1. Dr. Law

The ALJ described the opinion of Plaintiff's treating primary care physician, Dr. Law, and explained why he gave the opinion little weight:

> Dr. Law opined that the claimant is able to sit for less than one hour in an eight-hour workday, she must get up from a seated position every [fifteen] minutes and she is able to return to a seated position in less than five minutes, she must elevate both legs six inches or less while sitting, she is able to stand and/or walk for one hour in an eight-hour workday, she is able to lift and carry [ten] pounds occasionally, she is occasionally able to grasp and use her hands for fine manipulations bilaterally, she is frequently able to reach (including overhead) bilaterally, she would need to take unscheduled rest breaks for approximately five minutes approximately every [twenty] minutes, and she is likely to be absent from work as a result of her impairments or treatments three times a month on average [exhibit reference omitted]. Dr. Law's opinion is not consistent with the medical evidence of record, which indicates that, other than when recovering from her fractures, the claimant remained active, including riding a motorcycle and walking on the beach.

(Admin. R. 123, ECF No. 11.)

The ALJ failed to properly consider Dr. Law's opinion and should have accorded her opinion significant, if not controlling, weight. Even assuming the ALJ could properly find that Dr. Law's opinions were not entitled to controlling weight, the factors set forth in 20 C.F.R. § 404.1527(c) should have led the ALJ to give more weight to Dr. Law's opinion than he did. Dr. Law was Deanna R.'s treating primary care physician for the better part of three years, and she saw Plaintiff approximately every six weeks. (See id. at 731; see also id. at 306-09, 321-45, 416-21, 489-90, 648-53, 660-70, 763-68, 774-80, 792-97, 807-11, 818-23, 836-41.) Dr. Law therefore "obtained a longitudinal picture" of Plaintiff's impairments that the nonexamining physicians, Drs. Pan and Dwyer, did not possess. See 20 C.F.R. § 404.1527(c)(2)(i) ("When the treating source has seen you a number of times and long enough to have obtained a longitudinal picture of your impairment, we will give the medical source's medical opinion more weight than we would give it if it were from a nontreating source."). The "supportability" of Dr. Law's opinion lends further weight to her opinion. See id. § 404.1527(c)(3) ("The more a medical source presents relevant evidence to support a medical opinion, particularly medical signs and laboratory findings, the more weight we will give that medical opinion."). Plaintiff's treating physicians, including Dr. Law, believed that Deanna R.'s cryoglobulinemia (the clumping together of abnormal proteins in the blood possibly leading to damage in the skin, joints, nerves, and organs) was the cause of her neuropathy, and her blood tests confirmed the presence of cryoglobulinemia. (Admin. R. 387, 420, 731, ECF No. 11.) Plaintiff also exhibited scarring around her ankles from vasculitis and mild synovitis in her joints, and her nerve conduction study showed evidence of polyneuropathy. (Id. at 318, 731.) The "consistency" of Dr. Law's opinion with the record as a whole also merits additional weight being given to it. See 20 C.F.R. § 404.1527(c)(4). Dr. Law's diagnoses and opinion regarding Plaintiff's functional

abilities were largely consistent with those of Plaintiff's treating rheumatologist, Dr. Reddy, as well as with Plaintiff's testimony.

Because Dr. Law's opinion was contradicted by other medical opinions in the record, those of Dr. Pan and Dr. Dwyer, the nonexamining state agency physicians, the ALJ was required to articulate "specific and legitimate" reasons to reject the treating physician's opinion that were based on substantial evidence in the record. Lester, 81 F.3d at 830-31. He failed to do so. But the ALJ's sole reason for giving Dr. Law's opinion little weight was that he found her opinion "not consistent with the medical evidence of record, which indicates that, other than when recovering from her fractures, the claimant remained active, including riding a motorcycle and walking on the beach." (Admin. R. 123, ECF No. 11.) Although there are brief mentions in the record of Plaintiff riding a motorcycle and walking on the beach, the ALJ did not consider these activities in context. For example, although Deanna R. did tell Dr. Friedman that she rode a motorcycle, she also stated that when she did so, she had "issues with her hands" and "difficulty shifting with her left leg," (see id. at 315), which the ALJ ignored. Similarly, when Plaintiff told her medical providers that she took walks on the beach, she also mentioned that she was "still tired [a lot]" and that she was "unable to walk on the beach barefoot" due to her condition. (Id. at 763, 934.) While Plaintiff did state that she was able to walk several blocks and climb stairs, she also explained to her physician that pain in both of her lower extremities limited her ability to do so. (Id. at 842.) "The Social Security Act does not require that claimants be utterly incapacitated to be eligible for benefits, and many . . . activities may not be easily transferable to a work environment where it might be impossible to rest periodically or take medication." Garrison, 759 F.3d at 1016 (citing Smolen v. Chater, 80 F.3d 1273, 1285 n.7 (9th Cir. 1996)); see also Vertigan v. Halter, 260 F.3d 1044, 1050 ("[T]he mere fact that a plaintiff has carried on certain daily

activities, such as grocery shopping, driving a car, or limited walking for exercise, does not in any way detract from her credibility as to her overall disability.").

The Court finds that the ALJ's reason for discounting Dr. Law's opinion, that she "remained active," was cursory and not supported by substantial evidence in the record.

## 2. Dr. Reddy

The ALJ, likewise, gave little weight to the opinion of Plaintiff's treating rheumatologist, Dr. Reddy:

> I have given little weight to the opinion of Dana Reddy, M.D., as set forth in the <u>Disability Impairment Questionnaire</u> dated May 29, 2015 [sic]. Dr. Reddy opined that the claimant is able to sit for five to six or more hours in an eight-hour workday, she is able to stand and/or walk for one to two hours in an eight-hour workday, she does not need to avoid continuous sitting, she does not need to elevate her legs while sitting, she must get up from a seated position for five minutes every one to two hours, she is able to lift [ten] pounds frequently, she is able to carry [five] pounds frequently, and she is able to lift and carry [twenty] pounds occasionally, she is occasionally able to grasp, turn, and twist objects bilaterally, she is frequently able to use her arms for reaching (including overhead) bilaterally, and she is never/rarely able to use her hands/fingers for fine manipulations bilaterally, she would need to take unscheduled breaks at unpredictable intervals for five to [fifteen] minutes two to three times per day in an eight-hour workday, and she is likely to be absent from work as a result of her impairments or treatments two or three times a month (Ex. 23F [Disability Impairment Questionnaire completed by Dana Reddy, M.D., Sept. 15, 2016]). Dr. Reddy provided no explanation for the difference between the amount of weight the claimant is able to lift as opposed to the weight the claimant is able to carry on an occasional basis, or for the limitation on reaching. Furthermore, her opinion is inconsistent with the medical evidence of record, which indicates that the claimant was active in her activities of daily living, and she was observed handling objects during her appointment with the consultative psychological evaluation (Ex. 4F, p. 1 [Amended Psychological Testing Report completed by Marcie Goldman, Ph.D., tests administered Sept. 14, 2015]).

(Admin. R. 124, ECF No. 11.)

As with Dr. Law's opinion, even assuming the ALJ could properly find that Dr. Reddy's opinion was not entitled to controlling weight, he should have given more than "little weight" to her opinion based upon the factors set forth in 20 C.F.R. § 404.1527(c). According to the record, Dr. Reddy was Deanna R.'s primary treating rheumatologist for two years, and she saw her on eleven occasions. Dr. Reddy was thus able to obtain a longitudinal picture of Plaintiff's impairments. See 20 C.F.R. § 404.1527(c)(2)(i). Because she was a rheumatologist treating Plaintiff for a condition within her specialty, Dr. Reddy had "reasonable knowledge" of Plaintiff's cryoglobulinemia complaints as contemplated by § 404.1527(c)(2)(ii) as well as the "specialization" discussed in § 404.1527(c)(5). Deanna R.'s laboratory findings, limited sensation in her wrists and ankles, and rash with scarring on her lower extremities provided support for Dr. Reddy's opinion. (See Admin. R. 739, ECF No. 11; 20 C.F.R. § 404.1527(c)(3).) The "consistency" of Dr. Schulman's opinions with the record as a whole also merits additional weight being given to her opinion because it also comported with the opinion of Dr. Law, Plaintiff's primary treating physician, and other substantial evidence in the record. See 20 C.F.R. § 404.1527(c)(4).

The ALJ was required to articulate "specific and legitimate" reasons based on substantial evidence in the record to reject Dr. Reddy's opinion. Lester, 81 F.3d at 830-31. He did not meet this standard. The ALJ's finding that Dr. Reddy's opinion was entitled to little weight because she "provided no explanation for the difference between the amount of weight the claimant is able to lift as opposed to the weight the claimant is able to carry on an occasional basis" is not legitimate. Although lifting and carrying abilities are often paired, each of a claimant's exertional capacities (sitting, standing, walking, lifting, carrying, pushing, and pulling) are required to be considered separately. See SSR 96-8P, 1996 WL 374184, at *5 (July 2, 1996). By assigning differing weights to what Plaintiff could lift and carry on an occasional basis, Dr. Reddy was properly

assessing a claimant's functional capacity. The ALJ's criticism of Dr. Reddy's opinion ignores the distinctions between lifting and carrying objects, and the ALJ's conclusion is without substantial evidence to support it. It is also unclear why Dr. Reddy's finding that Plaintiff had a reaching limitation diminished her opinion, and the ALJ did not provide any rationale for this in his decision. The Court has already addressed, with respect to Dr. Law's opinion, that Plaintiff's report of activities, including riding a motorcycle and walking on the beach, does not necessitate a finding that Plaintiff is not disabled. The ALJ's statement that Deanna R. was "observed handling objects during her appointment with the consultative psychological evaluat[or]" lacked specificity, and Plaintiff's statement to the psychologist that her "hand problems come and go and that today is a good day," (see Admin. R. 363, ECF No. 11), was not sufficiently probative to undermine the doctor's opinion. There is other ample evidence in the record of Plaintiff experiencing problems with her hands. (See id. at 25-26 (flip handles installed on doors at home); 33 (unable to hold a bottle); 327 (unable to open bottles or pick things up); 339 (loss of sensation in hands, able to pick up a roll of quarters but not a single quarter); 363 (able to do chores only when hands not hurting).) The ALJ selectively relied on some entries in the record and ignored many others; therefore, substantial evidence does not support discounting Dr. Reddy's opinion. See, e.g., Holohan v. Massanari, 246 F.3d 1195, 1207 (9th Cir. 2001) (finding error when the ALJ selectively relied on certain medical records while excluding others).

In short, the ALJ's reasons for discounting Dr. Reddy's opinion were not sufficiently legitimate and were not supported by substantial evidence in the record.

### 3.    Efficacy of Plaintiff's Treatment

Defendant contends that the efficacy of Plaintiff's treatment was consistent with the residual range of functioning assessed by Drs. Pan and Dwyer, the state agency nonexamining physicians, that was relied on by the ALJ. (Def.'s Mot. Attach. #1 Mem.

Supp. Summ. J. 5-6, ECF No. 14.)  Specifically, Defendant notes that throughout the alleged disability period, Plaintiff reported that ibuprofen and gabapentin relieved her symptoms.  (Id. at 6.)  To the contrary, the record makes it clear that Plaintiff's medications only "took the edge off" her discomfort but did not relieve her symptoms. For example, Dr. Law noted that Deanna R.'s neuropathy was "controlled somewhat," but not fully, by gabapentin, (Admin. R. 420, ECF No. 11), which she did not take during the day because it made her sleepy.  (Id. at 321.)  Plaintiff told Dr. Reddy that despite taking 800 milligrams of Motrin for pain control, "sometimes the shooting pain and muscle spasms are so severe she cannot sleep."  (Id. at 715.)  It is also apparent in the record that Plaintiff reported that medications caused significant side effects that the ALJ did not account for in relying on the medical opinions of Drs. Pan and Dwyer instead of the treating physicians.  (See, e.g., id. at 648 (stating gabapentin caused sleepiness); 834 (reporting that Lyrica helped more than gabapentin but caused lightheadedness); see also id. at 26 ["[T]he medicine made me so spacy and so out there . . . ."].)  It was improper for the ALJ to rely on the effectiveness of Plaintiff's treatment and give greater weight to the opinions of the nonexamining physicians over the treating physicians, particularly when he ignored the side effects of those medications.

Under the standards in effect at the time Plaintiff filed her claim, (see 20 C.F.R. § 404.1527(c)(2)), Deanna R.'s treating physicians' opinions were entitled to more weight than the ALJ accorded to them.  The ALJ erred by failing to give sufficient weight to these opinions and by failing to articulate specific and legitimate reasons, based on substantial evidence in the record, to discount them.  "If additional proceedings can remedy defects in the original administrative proceedings, a social security case should be remanded." Lewin v. Schweiker, 654 F.2d 631, 635 (9th Cir. 1981).  The Court recommends that this matter be remanded for the ALJ to provide appropriate consideration to Dr. Law's and Dr. Reddy's opinions.

## B. Residual Functional Capacity

Plaintiff contends that the ALJ erred in his formulation of her residual functional capacity ("RFC") by not including the findings and opinions of her treating physicians. (Pl.'s Mot. Attach. #1 Mem. Supp. Summ. J. 19-21, ECF No. 13.) Defendant responds that the ALJ properly assessed Plaintiff's RFC and his finding at step four, that Plaintiff could perform her past relevant work as a bartender, was proper. (Def.'s Mot. Attach. #1 Mem. Supp. Summ. J. 9-10, ECF No. 14.)

Residual functional capacity is defined as "the most you can still do despite your limitations." See 20 C.F.R. § 404.1545(a)(1) (2019). "Ordinarily, RFC is the individual's maximum remaining ability to do sustained work activities in an ordinary work setting on a regular and continuing basis, . . . mean[ing] 8 hours per day, for 5 days a week, or an equivalent work schedule." SSR 96-8P, 1996 WL 374184, at *2 (emphases omitted). The RFC assessment is first used at step four of the sequential evaluation process to decide if the claimant can perform her past relevant work. 20 C.F.R. § 404.1545(a)(5)(i). If the ALJ decides that the claimant cannot perform her past relevant work, the same RFC assessment is used at step five of the sequential evaluation process to decide if the claimant can adjust to any other work that exists in the national economy. Id. § 404.1545(a)(5)(ii). In determining a claimant's RFC at steps four and five, the ALJ must consider all relevant evidence in the record, including medical history; medical signs and laboratory findings; lay evidence; the effects of treatment, including disruption to routine and side effects of medication; and the effects of symptoms, including pain. SSR 96-8P, 1996 WL 374184, at *5; see also Robbins v. Soc. Sec. Admin., 466 F.3d 880, 883 (9th Cir. 2006).

The RFC determination addresses both the remaining exertional and nonexertional capacities of the claimant. SSR 96-8P, 1995 WL 374184, at *5. "Exertional" capacities relate to an individual's physical strength and include the claimant's remaining abilities

with respect to sitting, standing, walking, lifting, carrying, pushing, and pulling. Id. "Nonexertional" capacities do not depend on physical strength but rather assess the individual's remaining abilities in the following areas: postural (e.g., stooping and climbing), manipulative (e.g., reaching and handling), visual (seeing), communicative (hearing and speaking), mental (e.g., understanding and remembering instructions and responding appropriately to supervision), and ability to tolerate environmental factors (e.g., tolerance of temperature extremes). Id. at *6. The determination of RFC is reserved to the Commissioner. Id. § 404.1527(d)(2). But the RFC assessment must always consider and address medical source opinions and, if the RFC conflicts with an opinion from a medical source, the adjudicator must explain why the opinion was not adopted. SSR 96-8P, 1995 WL 374184, at *7.

Here, the ALJ found that Plaintiff has the residual functional capacity to perform light work with the following exceptions:

> [T]he claimant is able to lift, carry, push, and pull [twenty] pounds occasionally and [ten] pounds frequently; she is able to stand and/or walk for six hours in an eight-hour workday with normal breaks; she is able to sit for six hours in an eight-hour workday with normal breaks; she is frequently able to climb ramps and stairs, balance, stoop, kneel, crouch, and crawl; she is occasionally able to climb ropes, ladders, and scaffolds; and she is frequently able to handle, finger, and feel bilaterally.

(Admin. R. 121, ECF No. 11.) The ALJ's determination of Plaintiff's RFC mirrors the opinions of the state agency physicians, Drs. Pan and Dwyer, regarding Plaintiff's functional capacity. (See id. at 58-60, 89-91.)

The Court finds that substantial evidence in the record does not support the RFC formulated by the ALJ. Specifically, substantial evidence does not support the ALJ's finding that Deanna R. could stand or walk for six hours in an eight-hour workday or that she is able to handle, finger, and feel on a frequent basis, or up to two-thirds of a workday. Additionally, the ALJ did not provide due consideration to the opinions of

27

treating physicians Drs. Law and Reddy.  Had he done so, he would have arrived at a comprehensive assessment of Plaintiff's RFC that addressed all the evidence in the record.  Specifically, Dr. Reddy found that while Plaintiff could sit for five to six hours in an eight-hour workday, she could only stand or walk for one to two hours.  (See id. at 741.)  Dr. Law similarly found that Plaintiff could stand or walk for approximately one hour a day.  (Id. at 733.)  The ALJ should have incorporated these findings into his RFC analysis because they were supported by substantial evidence in the record.  Both treating physicians also found that Plaintiff could grasp only occasionally and could only occasionally (per Dr. Law) or never (per Dr. Reddy) perform fine manipulations with her hands and fingers.  (See id. at 734, 742.)  These restrictions were also supported by substantial evidence in the record and should have been included in determining Plaintiff's RFC.  The ALJ additionally failed to account for any limitations that may have resulted from the side effects of Deanna R.'s medications or her diagnosis of Raynaud's syndrome.  See Robbins, 466 F.3d at 883 (stating that the RFC determination should consider side effects of medication); SSR 96-8P, 1996 WL 374184, at *5 (requiring ALJ to consider the limitations imposed by all of the claimant's impairments, including those that are not severe).

The ALJ erred by according the opinions of nonexamining physicians Drs. Pan and Dwyer more weight than those of the treating physicians when he assessed Plaintiff's RFC.  Dr. Pan's and Dr. Dwyer's opinions did not constitute substantial evidence because neither of their opinions was based on independent clinical findings.  Neither doctor offered a different diagnosis of Plaintiff's condition, and neither of their opinions was based on objective medical tests that the treating doctors did not consider.  See Orn, 495 F.3d at 632 ("When a [nontreating] physician relies on the same clinical findings as a treating physician, but differs only in his or her conclusions, the conclusions of the [nontreating] physicians are not 'substantial evidence.'"); see also

Lester, 81 F.3d at 831 ("The opinion of a nonexamining physician cannot by itself constitute substantial evidence that justifies the rejection of either an examining physician or a treating physician.") (citation and emphasis omitted).

The ALJ's RFC assessment is adequate only if it considers all relevant evidence in the record. Robbins, 466 F.3d at 883. That is not the case here. Therefore, Plaintiff's RFC, upon remand, should be reevaluated.

## C.  **Hypothetical Question to the VE**

"In order for the testimony of a VE to be considered reliable, the hypothetical posed must include all of the claimant's functional limitations . . . supported by the record." Thomas v. Barnhart, 278 F.3d 947, 956 (9th Cir. 2002) (internal quotations and citation omitted). "[A]n ALJ is not free to disregard properly supported limitations." Robbins, 466 F.3d at 886. Notwithstanding Plaintiff's argument that the ALJ failed to present a complete hypothetical question to the VE, (see Pl.'s Mot. Attach. #1 Mem. Supp. Summ. J. 21-23, ECF No. 13), the ALJ modified his original hypothetical question several times and presented multiple hypothetical questions to the VE. (See Admin. R. 41-46, ECF. No. 11.) Thus, on remand, the ALJ will be able to revisit his hypothetical questions to the VE and ensure that they accurately depict Plaintiff's residual functional capacity. Based on the current state of the record, the ALJ's reliance on the VE's response to his primary hypothetical question to support his step four determination that Plaintiff could perform her past relevant work as a bartender was error.

## III.    CONCLUSION

For the reasons stated above, the Court recommends that Plaintiff's motion for summary judgment be **GRANTED**, Defendant's cross-motion for summary judgment be **DENIED**, and the case be remanded for further proceedings.

/ / /

This Report and Recommendation will be submitted to the Honorable Thomas J. Whelan, United States District Court Judge assigned to this case, pursuant to the provisions of 28 U.S.C. § 636(b)(1). Any party may file written objections with the Court and serve a copy on all parties on or before April 29, 2020. The document should be captioned "Objections to Report and Recommendation." Any reply to the objections shall be served and filed on or before May 20, 2020. The parties are advised that failure to file objections within the specified time may waive the right to appeal the district court's order. Martinez v. Ylst, 951 F.2d 1153 (9th Cir. 1991).

Dated: March 30, 2020

Hon. Ruben B. Brooks
United States Magistrate Judge

19cv1358-W(RBB)